Bland, Chancellor.
Ordered, that the said petitioners be and they are hereby permitted to become parties complainants as prayed.
After which John Ridgely filed a similar petition stating, that he also was a creditor of the deceased to the amount of $406; and prayed to be allowed to come in as a co-plaintiff; which by an order of the 29th of December, 1827, was granted. The original plaintiffs recommended G. Wells, Jr. as trustee; and the solicitor of the petitioners recommended L. Gassaway for that office. Upon which the case without objection or opposition was submitted for decision.
*511 5th May, 1828.
Bland, Chancellor.
As this is a creditor’s suit, in which it is evident, that there must be a sale of the real estate of the deceased for the payment of his debts, it stands now, according to the course of the court, ready for a decree to that effect, without having been regularly set for hearing; and it has been submitted accordingly, without argument or controversy of any kind; except as to who shall be appointed trustee to make the sale. The original plaintiffs recommend G. Wells, Jr. and the petitioners, who have been admitted as co-plaintiffs, recommend L. Gassaway. The petitioners have been permitted to come in since the defendants had answered; the suit, therefore, as to such petitioners has been, in effect, so instituted as not to call on the defendants to answer as to a bill of complaint against them; and consequently, as the validity of the petitioners’ claims have not, as yet in any way, been put in issue, the decree now about to be passed for a sale cannot, in any respect determine, that they, like those of the original plaintiffs, not having been contested, must be taken to have been sufficiently established. Nevertheless, so far as regards the appointment of a trustee, the recommendations of such creditors may be allowed to have their due consideration, (a) Here, however, the bank merely alleges, that it is a creditor of the deceased to a very large amount, without saying how much; and the petitioner Ridgely states his claim to be about $400. Therefore, as the parties have given no reasons for their recommendations, the Chancellor must allow that of the original plaintiffs to have the greatest weight, as they have at this time shewn the largest specified amount of claims.
Decreed, That the real estate, whereof Beale M. Worthington died seized, or possessed, or so much thereof as may be necessary, be sold for the payment of his debts; that George Wells, Jr. be appointed trustee, to make the sale, See. Sec.; which sale shall be on a credit of four, eight, and twelve months from the day of sale, with interest, &c. &c.; and that the trustee give notice to the creditors of the deceased to file the vouchers of their claims within four months from the day of sale.
After which, Elizabeth R. Worthington, by her petition, stated, that she was the widow of the late Beale M. Worthington, and as such, was entitled to dower in the real estaté, of which he died *512 seized; and which had been decreed to be sold. Whereupon she prayed, that a commission might be issued, to assign dower to her. And recommended Thomas H. Dorsey, James Wells, Eli Lusby, Jacob Waters, and Caleb Dorsey, to be appointed commissioners for that purpose.
2d July, 1828.
Bland, Chancellor.
The bill states, that Beale M. Worthington, the deceased, left a widow, Elizabeth R. Worthington, and the infant children, these defendants, his' heirs; and then prays, that the real estate of the deceased may be sold for the payment of his debts. Hence, taking this petitioner to be the widow mentioned in the bill, it virtually recognizes her legal right to dower; and therefore, there need be no hesitation in at once, according to the established course of the court in similar cases, either granting a commission to have dower assigned to her, or in directing the land to be sold subject to her claim; or in awarding to her a proportion of the purchase money in lieu thereof. But, as in this case, the widow is not a party to the suit; and the defendants are infants; it may not be amiss to allow the plaintiffs to show cause, if any they have, why a commission should not issue as prayed, leaving the application open to any further objections when the court shall, upon the return of the commissioners, be called on for a decree confirming the assignment of dower so made to her. (b)
Ordered, that a commission issue as prayed, to the persons recommended; unless cause 'to the contrary be shewn on the 16th instant; provided, that a copy of this order, together with a copy of the aforegoing petition and recommendation, be served on the plaintiffs or their solicitor, on or before the 9th instant.
The plaintiffs consented that a commission should issue as prayed, which was issued accordingly. Upon which, the commissioners made return, that they had assigned to the widow her dower, according to certain metes and bounds as therein specified, and as shewn by the annexed plot thereof, (c)
The trustee appointed to make the sale, reported that he had, on the 4th of April, 1829, made sale of the real estate as directed *513 by the decree, in several parcels, by the acre, amounting to $6,352 63; which sales were, on the 10th of August, 1829, finally ratified and confirmed; and that he had also, as directed, given notice to the creditors of the deceased to bring in their claims.
After which, about forty creditors filed the vouchers of their claims. It appeared from the evidences of the claim of James Deale, that it was upon a note drawn in favour of, and endorsed by the deceased; and from those of the Farmers’ Bank, that they were notes drawn by William Warfield in favour of, and endorsed by the deceased ; or by John W. Clagett, in favour of, and endorsed by the deceased; or by D. Ridgely if Co. in favour of, and endorsed by the deceased. In relation to these claims, the affidavit of John W. Duvall, was taken and filed, in which he states, that from his own knowledge, William Warfield, then deceased, was insolvent; that he verily believed, and had so understood from others, that William Warfield, then deceased, David Ridgely, and John W. Clagett, who composed the late firms of Warfield Sf Ridgely, and D. Ridgely 8f Co. were insolvent, and unable to pay their debts; and that he verily believed, and from general reputation, the above mentioned firms, and the individuals composing them, have been considered as utterly insolvent, and were still so. And also, the affidavit of Robert Welch, of Ben. in which he stated, that from his own knowledge, and from what he had understood from others, he verily believed, that William Warfield, then deceased, David Ridgely, and John W. Clagett, who composed the late firms of Warfield 8f Ridgely, and D. Ridgely Co. were insolvent and unable to pay their debts; that all process of writs of fieri facias against the said firms, and the individuals composing them, which came into his hands as sheriff of Anne Arundel county, were returned nulla bona; that he was a creditor to a large amount, of which he had never received one cent; and that from general reputation, the firms, and the individuals composing them, as above stated, have been considered as utterly insolvent, and were still so.
On the 25th of September, 1829, the auditor filed his report, made up to the 23d instant, in which he says, that he had stated all the claims which had been exhibited against the estate of the deceased; that he had also stated an account between the said estate and the trustee, in which the proceeds of sales were applied to the payment of the trustee’s allowance for commissions and expenses, the *514 costs of survey and of suit; and dividends on all the claims so stated. But that the account was stated, subject to the following objections to particular claims. James Deale’s, No. 3, and the bank’s, No. 26, were founded on notes drawn by William Warfield, in favour of, and endorsed by the deceased to the present claimants. The bank’s, No. 18, was on John W. Clagett’s note, in favour of, and endorsed by the deceased to the present claimants. The bank’s, Nos. 19, 20 and 25, were founded on notes of D. Ridgely 8f Co. in favour of, and endorsed by the deceased to the present claimants. The bank’s, No. 21, was on Warfield fy Ridgely’s note, in favour of, and endorsed by the deceased to the present claimants. That those claims could not be allowed without proof of the insolvency of the drawers. That affidavits had been filed by the claimants, as evidence of such insolvency; which were deemed insufficient; because they spoke only from the belief of the deponents, and from general reputation. But individual opinion or general reputation, furnished no such clear evidence of the utter insolvency of the principal debtor, as to give to the creditor his equity against the estate of his surety. That the general testimony of the affidavit, that all process of writs of fieri facias, had been returned nulla bona, was not evidence of any return upon a judicial writ. That if any evidence, short of a discharge, under the insolvent laws, were admissible, there should be proof of nulla bona on executions issued by the claimants to collect the very debt then claimed; since the rule of the court required some evidence of the exercise of reasonable diligence on the part of the creditor, to enforce payment from the principal debtor; and did not permit the creditor to derive any assistance from the inconclusive acts of other creditors.
The auditor further said, that George Wells’ claims, Nos. 39,40, 41 and 42, were debts due from the deceased to Warfield £f Ridgely, and D. Ridgely 8f Co., and assigned by them to the present claimant. That the deceased had in his life-time, endorsed sundry notes drawn by the said firms, which remain unpaid, and were then exhibited as claims against the deceased’s estate; but as the assignee should take subject to all the equities which might have been raised against the claims, in the hands of the original creditors, no part of said claims should be allowed until the deceased’s estate has been indemnified against the said endorsements. The amount of the endorsed notes greatly exceeds the amount of the aforesaid claims. The auditor further said, that A. Sf J. Miller’s claim, No. *515 44, originated after the death of the deceased, and ought not to he allowed; and in conclusion said, that he understood a distribution of personal estate had been made by the deceased’s administrator; but no dividends were credited on George and John Barber’s claim, No. 1; John W. Duvall’s, No. 5, Charles T. Flusser’s, No. 7; Henry Hammond’s, No. 8; A. &f J. Miller’s, No. 13, 14, 35 and 44; Joseph Phelps’, No. 16; John Randall 5r Son’s, No. 27; C. Salmon’s, No. 32; George Shaw’s, No. 33; Anderson Warfield’s, No. 37; George Wells’, Nos. 39, 40, 41 and 42; or Henry Wilmot’s, No. 43. Upon this report of the auditor, the case was submitted, as to all such matters as were not controverted.
15th May, 1830.
Bland, Chancellor.
Ordered, that the report of the auditor be, and the same is hereby ratified and confirmed ; and the trustee is directed to apply the proceeds accordingly. Bnt all claims to which any objections whatever have been made, as therein mentioned, are hereby reserved until further order.
On the 18th May, 1830, the claimant, James Deale, excepted to this report; first, because it did not appear from any part of the proceedings, that Beale M. Worthington was surety for William Warfield; and if Worthington was a surety,- it was not necessary to prove the insolvency of Warfield ; and second, because the affidavits of Duvall and Welch, afford sufficient evidence of such insolvency. And on the 20th of May, 1830, The Farmers’ Bank of Maryland, a creditor, also excepted to this report; first, because there was no evidence that Beale M. Worthington was surety on the notes which are the foundations of said claims; and did not receive a valuable consideration thereof; and second, because if he was, the proof was sufficient of the insolvency of the other parties. And on the same day, George Wells, a creditor, in like manner excepted; first, because if the objections to claims Nos. 3, 18, 19, 20, 21, 25 and 26 be valid, the estate would be released from the said endorsements; and therefore, the auditor’s reasons for rejecting the exceptant’s claims would cease; and second, because if the objections to Nos. 3, 18, 19, 20, &c. should be over-ruled, it does not appear that this claimant had notice at the time of the assignment, of said endorsements.
10th June, 1830.
Bland, Chancellor.
This case standing for hearing, on the exceptions to the auditor’s report, the solici *516 tors of the parties were fully heard, and the proceedings read and considered.
The general principles, referred to by the auditor, as the foundation of his objections to the several claims for which the deceased became liable only as an endorser, are these: That wherever it appears, from the voucher filed by a creditor as evidence of his claim, that the deceased was in any way jointly liable with others, the creditor must shew whether or not the deceased was equally bound as a co-debtor, or as principal, or surety, or whether he was bound with others as a co-surety. If he was bound as principal debtor, then the creditor is allowed to come in for the whole amount of his claim. But if the deceased was only bound as one of two or more principal debtors, then the creditor must shew that the other principal debtors are insolvent, or he will not be allowed to come in for the proportion which such other principal debtor might have been made to pay. If the deceased was only a surety, then the creditor must shew that the principal is insolvent, or he will be excluded altogether. And if the deceased was one of several sureties, then the creditor must not only shew that the principal is unable to pay, but that the other sureties are insolvent, or he will not be allowed to claim more than the equitable proportion for which the deceased was liable. If these facts and circumstances do not necessarily or sufficiently appear from the vouchers, filed as the foundation of the claim, then the burthen of explanation and proof is thrown upon the creditors, and that, too, by the ex officio act of the court, without any suggestions or objection to that effect being made by any other creditor or party in the ca.se.
When I came here I found that these principles had been considered as long settled; but I have never been able to persuade myself tp approve of them; and now, after some years of observation, I am satisfied that they occasion much embarrassment and delay in the administration of the real assets of deceased debtors; and oftener than otherwise result in absolute wrong and injustice to creditors against whom not the slightest misconduct can, in any manner, be imputed. I shall, therefore, as their correctness and true application have been called in question by these excepting creditors, take this occasion to examine the reasons and grounds upon which they have been rested.
It would seem that these principles, in relation to the administration of the real assets of deceased debtors, had been first introduced in the time of Chancellor Hanson. Speaking in refer *517 ence to this subject, in an order passed on the 20th of March, 1800, he says, c there is no proof relative to the circumstances of George Garnet, or the two other securities, William Clayton and Nathan Wright. When claims are exhibited against an infant’s estate, and it appears that the debt was due from the deceased and another, or others jointly, it has been the Chancellor’s uniform practice to allow only the just proportion to come out of the infant’s estate. The practice is founded on this consideration, that, on an application by creditors, for the sale of an infant’s estate, it is a matter of sound discretion, whether or not the Chancellor will decree a sale. He is governed by circumstances. In case of a debt due from the ancestor or devisor jointly with another who is solvent, the Chancellor might say I will not decree a sale, or I will not suffer you to receive your debt from the infant’s estate, because you have it in your power, or had it in your power, since the ancestor’s or devisor’s death, to recover your whole claim from the other debtor. But the Chancellor conceived, that to avoid circuity of action, and do justice to all, it was proper to charge the infant only his just proportion; or to admit the claim against the estate for only a just proportion, Were Garnet, William Clayton, and Nathan Wright all insolvent? Was one of them solvent, and the others not? Have any steps been taken to recover from them? It is certain, perhaps, that they are now protected by the act of limitations; but is this a reason wherefore Clayton’s estate is to be charged with the whole ?’ (d)
During the whole time of Chancellor Kilty, these principles appear to have been continually recognized as the settled law of the court; and in one case of a creditor’s suit, where he himself was the originally suing creditor, he evidently acquiesced under them, although they were opposed to his own interest; and asked a decision from the judge, to whom his case was necessarily submitted, founded upon their admitted correctness and established authority, (e) But although they appear to have been so repeatedly recognized by Chancellor Kilty, yet I have met with no case, in which he has given any reasons by which he had conceived they might be sustained.
Chancellor Johnson, in an order passed on the 10th of April, 1822, in a creditor’s suit, addressing himself immediately to this subject, says, ‘the complainants except to that part of the auditor’s *518 report unfavourable to the claim of Nicholas Hammond, which claim is founded on a bond executed by one John Mace and William Frazier, the above deceased, as security. The auditor, in conformity with the usual course of the court, would not allow the claim without evidence to establish the allegation in the bill, that Mace, the principal debtor, was insolvent. A court of equity, when it interposes and adjusts the relative obligations of contracts and agreements, in which more than two parties are concerned, calls them all before the court; that a complete and final adjustment may take place, and each be compelled to pay his just portion; and thereby, the creditor draws from each, being solvent, what equitably ought finally to be drawn from him. It will not compel the one, both of the debtors being solvent, to pay the whole, and turn him over to his co-security to restore one-half. When, therefore, estates are sold to pay debts; and in which the interests of minors are generally deeply involved, it becomes the duty of the court to see that no claim be allowed, in which the deceased, with others, stands indebted, without satisfactory proof being produced, that the other persons joined in the obligation, were insolvent. But as that proof is now produced in support of the claim No. 4, the same is hereby allowed.’ (f)
From these adjudications it appears, that the first position taken in support of these principles, in relation to the administration of the real assets of the deceased debtor, is, that this court may, in its discretion, withhold from the creditor, the relief he asks, altogether, in favour of an infant heir or devisee; and therefore, does no wrong in granting relief upon terms.
The interests of infants, femes covert, and persons non compos mentis, are always especially attended to, when brought before a court of equity; but I have never understood that the course of justice could be arrested, or in any manner turned awry for their benefit. Their disabilities always excite sympathy, and suggest caution where their interests may be affected; and so far the equitable circumspection of the court in regard to such persons, may be considered as affording to them a just ground to call for the most careful deliberation; and for its ex officio protection, so far as may be compatible with a duty to others, and an impartial administration of justice ; but under no circumstances, have they been allowed to pervert any such claims to a special consideration *519 and protection, into a means of impairing the rights of others. There are instances in which a remedy may be suspended in favour of an infant; but it is believed, there is no case in which a court of justice is allowed, at its discretion, to withhold relief from a plaintiff who has established his claim, or to impose such terms upon him, as may greatly delay or endanger the loss of his whole legal right.
At the common law, there are many instances where, on an action being brought against an infant, the parol shall demur; or in other words, where the prosecution of the suit to judgment and execution shall be suspended, until the infant attains his full age. If an action of debt be brought by a bond creditor, against an infant heir, in respect of real assets descended to him, the parol shall demur, until he attains his full age, even though the debt be clear and indisputable. The privilege of the heir himself, is however, in this respect, anomalous, and confined to the heir alone. It was allowed to him as well on account of his inability to defend himself, as also from an absolute deficiency of funds, arising from the nature of the feudal tenures, by which the whole estate, with its rents and profits, were given to the guardian in chivalry. This privilege was, at the common law, for some reasons not now appearing, extended indiscriminately to all heirs; and to cases where judgment having been obtained, and the defendant died before execution, the heir was within age; and in favour of the widow, and all the heirs in co-parcenary during the infancy of any one of the parceners. (g)
This legal privilege was distinctly recognized by one of our early acts of assembly; (h) and by another of them it has been expressly declared, that all persons under the age of twenty-one years, entitled to any hereditaments by purchase, shall not be obliged to answer any suit in relation thereto, any more or otherwise than they would be if they had become their right by descent. (i) Hence it appears, that in all cases where an infant, who takes by purchase, might have had the privilege of causing the parol to demur, had he taken by descent, the like privilege shall be extended to him for the protection of. the inheritance held by him as a purchaser. And it was also the practice of the land *520 office, under the provincial government, to let every thing stand in which an infant was concerned, until he attained his full age. (j)
But in equity it is, in some respects, otherwise. The interests of an infant are so far taken care of, that no decree will be made against him, without allowing him to shew cause after he comes of age; and the court never pretends to change the nature of an infant’s estate, or make that absolute which was defeasable,. or to shield an infant, or his property, from any just stipulation or legal liability which had been fairly incurred in a regular course of law. (k) In all cases where the debtor, by his will, charges his real estate with the payment of his debts, any creditor may, in behalf of himself and the other creditors of the testator, by a bill against the executor, devisee, and heir, on establishing his claim, and the insufficiency of the personalty, have the real estate immediately sold for the payment of the debts, notwithstanding the infancy of the heir; because such a devise breaks the descent, or because the real estate is considered as having descended to the heir as a mere trustee for the benefit of the creditors of the testator. (l) But where the real estate has not been so charged by the debtor; and has been suffered to descend to his heir, in such case the parol demurred in equity as at common law; and there could be no decree for a sale until the heir attained his full age. (m)
The disability of a feme covert is also regarded with kind attention by a court of equity,.and her interests are carefully protected. Yet she has never been indulged with any such privilege as that of having the proceedings suspended, or of having a day allowed her to shew cause after she became sole, as is granted to an infant; but if the plaintiff establishes his case, he has a right to demand an absolute decree against her and her estate. (n)
At common law, as in equity, a person non compos mentis may be sued, and a judgment or decree obtained against him; he may be arrested and held to bail, or imprisoned for want of bail; but in equity, although he must himself be made a party, yet the court will assign him a committee to appear and defend in his behalf, *521 and without hindrance or delay to his creditors, do what it can to save his estate for his benefit, (o) It is, however, certain, that the change of condition of a person who' has entered into an agreement by becoming a lunatic, or the death of a debtor and the descent of his estate, which has been incumbered, or is chargeable with the payment of his debts, will not alter the rights of the parties, which will be the same as before; provided they can come at the remedy, (p)
Such was the law of Maryland when, by a British statute, passed the year 1732, and soon after adopted here, lands in this state were made liable to be taken in execution, and sold for the satisfaction of all debts; (q) which, however, did not prevent the parol from demurring. (r) After which, it was, by an act of assembly, declared that any real estate held by an infant, or person non compos mentis, might be sold for the satisfaction of the money with which it was chargeable, upon a bill filed in, and by a decree of the Court of Chancery, with the consent of the guardian of the infant, as therein prescribed, (s) And where an action at common law has been brought, in which the title to real estate is involved, which action has abated by the death of either the plaintiff or the defendant, and such title has descended, or been devised to an infant, it is declared that the action shall not be tried during the minority of such infant, unless his guardian, or next friend, shall satisfy the court that it will be for his benefit to have it tried. (t) By another legislative provision, it is made the duty of heirs and devisees of full age, or upon their arrival at the age of twenty-one, in case of a deficiency of personal assets, to pay the debts of their ancestor or devisor out of the real assets, in the same order and manner in which they would have been paid out of the personalty, (u)
But in equity all the real estate of a deceased debtor, whose personal property is not sufficient to pay his debts, is, by positive legislative enactment, made absolutely liable to be immediately sold for that purpose, without delay, notwithstanding its having descended, or been devised, to an infant, or person non compos mentis, and that, too, without requiring, as formerly, a conveyance *522 from the infant when he comes of age, or allowing him a day to shew cause. The decree, sale, and conveyance by the trustee in pursuance thereof, being made equivalent to a conveyance from such heir or devisee, as of sound mind and full age. (w) In case the creditor establishes the claim, and the heir or devisee does not allege and shew a sufficiency of personal estate to pay the debts, this law leaves to the court no discretion whatever; it must decree a sale of so much of the realty as may be sufficient to satisfy the debt for which it has been thus shewn to be liable. This law not only leaves to the court no discretionary power to refuse to sell; but it is strongly indicated, by its terms, that the debt is to be satisfied out of such real assets, without any condition or reservation whatever, according to the full extent of the legal liability of the deceased debtor; that the contract of the creditor is to be, in no respect, embarrassed or impaired, and that he is, without delay, to obtain satisfaction from the real assets of the deceased, in as complete and ample a manner as he could have had against the debtor himself, were he then alive.
I am therefore satisfied, that this first position, ás to the discretionary power of the court, upon which these principles in relation to the distribution of the real assets of a deceased debtor have been rested, must altogether fail.
Another position taken in support of these principles, is, upon the general rule in equity, that where a debt is joint and several, the creditor should bring each of the debtors before the court. The reasons for which general rule are, that such debtors are entitled to the assistance of each other in taking the account; that it is necessary to prevent circuity of action; because the court may decree over as between the defendants according as they may be entitled to contribution in paying the debt; or where one may have paid more than his share; and that if there are different funds, as where the real and personal assets are in the hands of the heir, and executor, who are to that extent both liable, the creditor must make both of them parties, as the personalty must be first applied to the satisfaction of his claim, and the realty only in aid of, and so far as may be necessary to make up the’ insufficiency of the personal estate. The exceptions to this rule are, first, where those of the obligors who have not been made parties are only sureties ; *523 secondly, where it plainly appears and is admitted, that nothing has been paid, and that the co-obligor is insolvent; thirdly, where it clearly appears and is admitted, that there are no personal assets, the personal representative need not be made a party; and lastly, where the creditor had obtained judgment at law against the one of the several obligors who is the defendant in equity, it is not necessary to bring the other obligors before the court, because the bond is drowned in the judgment, (x)
But the cases in which this general rule is laid down, do not profess to declare, that the obligee, on a joint and several bond, may not sue one or both obligors ; but that he may, if he pleases, sue one only, or all, as at law. For, if it were not so, there would be no difference in equity betwixt a joint bond, and one joint and several; and if any of the obligors have paid all or a part, the obligor who is sued, or his representative must bring a bill and have it.allowed; and it must also lie upon him to compel the other obligors to contribute towards payment of the debt; not upon the creditor who lent his money upon a security that enabled him to sue the obligors severally, if he should think fit; and indeed, if it were otherwise, that which was intended to strengthen the security would tend to hurt it extremely; for the creditor might not be able to find out all who might thus be bound to him; because by the same reason, that all the other obligors themselves must be sued, if any of them were dead, their heirs as well as executors must be made parties; and then, as it would be difficult to commence the suit; so the suit, when commenced, would be subject to continual abatements, which would be a great difficulty on an honest creditor who had fairly lent his money, (y)
But if these principles are to be sustained by any thing to be deduced from this general rule, that all persons interested must be made parties; then it would be indispensably necessary, in every creditor’s suit, when a creditor presented a claim, for the satisfaction of which the deceased with others had been bound, that such creditor should be permitted and required, in some way, to make all the co-obligors of the deceased parties to the same case; for *524 otherwise, it would be impossible, or improper, or unsafe, according to the reasons of the principles of the court to decide upon the relative equities of the deceased debtor whose representatives were then before the court and his co-obligors; without compromiting the interests of some, or doing gross injustice to the creditor.
Under our system of partible inheritances the difficulties which beset a creditor’s bill, by which it is necessary to bring before the court a large family of heirs and devisees of a deceased debtor, together with his executors or administrators, have been found to be so very great, that it has been attempted to remedy the evil by requiring the heir at common law alone to be served with process, and allowing all the others to be called in, by a general publication, and to appear or not as they might think proper. (z) There is, however, no instance to be found in the English books, nor among the records of this court, of a creditor’s suit, in which it was ever proposed to make a co-obligor of the deceased debtor a party to the suit. But if, in addition to the family of representatives of the deceased debtor himself, the families of his co-obligors, were, in like manner, allowed, or required to be brought before the court by each of the creditors to whom they were bound, the parties would be innumerable, abatements would be continual, the suit would be interminable, and justice suspended and withheld forever.
This general rule, that all persons interested must be made parties, is, however, made to yield where necessary in the instance either of plaintiffs or defendants ; since the rigid enforcement of it would lead to perpetual abatements, and in many cases amount to an absolute denial of justice. In all such cases the rights of the omitted parties are held to be established or bound by the decree; and although, in England, an inconvenience arises, as to the omitted parties, where a specific performance, or a conveyance may be required of all; (a) yet even that difficulty has been, in a great measure, removed by our act of assembly which declares, that in all cases where a decree shall be made for a conveyance, release, or acquittance, and the party shall neglect or refuse to comply therewith, such decree shall stand, be considered, taken, and have the effect of the conveyance, release, or acquittance so ordered. (b)
Hence, as it would be difficult or impracticable, and therefore is *525 not necessary to bring all the co-obligors of the deceased before the court; it is manifest, that these principles can derive no support from this rule which requires every one interested to be made parties, to the end that complete justice may be done among all.
But this general rule which requires each debtor, bound by a joint and several obligation to be brought before the court, although it may, to a certain extent, be well founded as to cases where a single creditor sues his living debtors only, or sues one of his joint debtors together with the representatives of another, who is dead, for the recovery of no more than his own particular debt; yet it cannot be applied to a suit, the especial object of which is to have the whole estate of the deceased sold for the payment of his debts; or so much of it as may be necessary for that purpose. A creditor’s suit, or a bill which presents a case which requires to be treated as a creditor’s suit, does not profess to be a demand of payment by a single creditor for himself alone; but is a call upon the court to cause the assets, real and personal, of a deceased ' debtor to be accounted for and administered in due course of law for the benefit of all the creditors of the deceased. This is the nature of a creditor’s suit according to the English law as well as the law of Maryland; and it is expressly declared by our act of assembly, with an evident reference to a creditor’s suit, that the real assets shall be administered by the heir, of full age, in the same order as the personal assets are directed to be applied in payment of debts by an executor; and that all courts of law and equity shall observe the same rules, (c)
It was the course of this court for some time after the establishment of the republic, in a creditor’s suit, merely to decree in general terms, that in so far as the deceased debtor’s personal estate should be insufficient to pay his debts, his real estate should be sold for that purpose ; to appoint a trustee to make the sale, after he had given bond for the faithful discharge of his trust; and to direct him to pay the debts due to the originally suing creditors, whose claims were established by the decree; but, as to all other claims and every other matter, leaving to him the same extent of discretionary authority in the administration of the proceeds of the sale of the real assets as that allowed to an administrator of the personalty; or in other words, giving him the power to dispose of and distribute the proceeds of the sale of the real estate in due *526 course of law; without requiring them to be brought into court; and without calling on the creditors to file the vouchers of their claims in the chancery office in order to have them passed upon and sanctioned by the court, (d) This course of proceeding was. altered about forty years ago, and since that time the proceeds of the sale of the real estate have been always ordered to be brought in; and the creditors called before the court, that the rights of each and the conflicting interests of all might be adjusted by the court itself, and a distribution made among them accordingly.
Hence, it appears from a review of the course of proceeding in this court on creditors’ bills, under all the mutations and improvements it has undergone, and from the legislative enactments in relation to the subject, to have always been a settled general principle, that the real assets were to be administered by the heir, or by this court, in like manner as an executor was required to administer the personal assets. But there is no instance, where, in a suit against an executor, either at law or in equity, the suing cre>ditor has been told, that before he could be allowed to obtain a judgment or decree for satisfaction, he must shew that the late *527 obligor was the principal debtor; or if a surety, that his principal or co-surety, was insolvent; and yet, if the principles of this court be correct, they should certainly be as fully applicable in a suit at law or in equity against a personal representative, as in a suit against the heir or holder of the realty. Consequently, it is evident, that these principles of this court, are incompatible with the spirit, if not the very letter of our legislative enactments, and with the general tenor of those rules, according to which the assets of a deceased debtor are administered in every other court.
A third ground assumed in those decisions of my predecessors, is, that where the debt appears to have been contracted by the deceased, jointly with another who is solvent, the court should refuse to suffer the creditor to have an infant’s estate sold; because such a creditor has or had it in his power, since the ancestor’s or devisor’s death, to recover the whole claim from the other debtor.
In considering this position, it will be necessary to recollect, that it was originally and has always been applied to cases of mere personal transitory contracts, by which two or more are bound by the terms of the contract for the payment of money. It has not been exclusively applied to those cases where the creditor had received from his debtor a pledge or pawn of property, which he stipulated to have appropriated to the satisfaction of his claim in the first instance, before he made any personal demand upon his debtor; nor has it been confined to those cases in which the creditor had accepted from his debtor an assignment of a bond, note, or chose in action, as a conditional payment, where, by the terms of the contract, the creditor is bound to use due diligence, in order to make the means of satisfaction, so placed in his hands, available ; or excuse himself by shewing, that the pawn has been found insufficient, or that the debtors bound by such assigned chose in action, are insolvent, and that he has actually returned, or is, and has always been able and ready to return the chose in action so assigned. It cannot be denied, that the principles of the court so far as they have a direct bearing upon such cases as these, are sustainable by the clearest reason and equity; and indeed, have been enforced in courts of common law as well as in this court, (e)
*528 This third position, taken in support of the principles of this court, rests upon the general doctrine in relation to principal debtor and surety. It is alleged, that the creditor must be excluded from any participation in the deceased’s estate; because he had it in his power to recover his whole claim, or a due proportion of it, from the principal debtor, or the other sureties; or because he is chargeable with some injurious negligence as regards the deceased debtor, whose estate the court is then about to distribute. And assuming these allegations to be true, until the contrary is shewn, the court calls upon the creditor to explain the transaction, and to shew which of the obligors is the principal, and which the surety.
In the common case of a money bond, there is no distinction upon the face of it, between the principal and surety; nor is it necessary to be shewn in any suit upon such a bond, who is principal and who is surety; except for the purpose of administering the equities that arise between the principal and sureties. Such an instrument shews only, that the creditor has parted with his property, or lent his money on a security, by which two persons are jointly and severally bound to him. The contract is legal and fair; and therefore, as to him, they are both principal debtors; though with respect to each other, they may stand in the relation of principal and surety. Of the interests or motives between them, the creditor has, or need have no knowledge. All he looked to was a security, by which two persons were equally and jointly bound to him; and that his security had an admitted legal obligatory force fully to that extent. And if the bond were joint only, still as against other creditors even, and in the administration of assets, it would be allowed to have the effect of a several bond. (f) Yet, according to these principles of this court, the creditor must not only know which of the obligors is the principal debtor, and which the surety, but may have the burthen cast upon him of developing by proof, the latent circumstances of the contract itself; and of shewing that the other obligors, who were bound with the deceased, are insolvent. Thus assuming, as established matters of fact, until the contrary is shewn, that the deceased was a surety only; that the principal debtor, and all the other obligors, are well able to pay on demand; and that the creditor, knowing all this, is making an unjust attempt to oppress the representatives of the *529 deceased; or to obtain satisfaction from his estate, to the prejudice of his other creditors.
The assumption of the truth of these allegations, and throwing the burthen of proving the contrary upon the creditor, is manifestly at variance with that equity by which all other analogous cases between debtor and creditor is grounded. It is laid down, in all such cases, that he, whether he be in reality principal or surety, on whom the creditor calls, must pay; and that the holder of the security may lay hold of the surety even in circumstances under which the surety may not have the same benefit that the creditor had. (g) With the exception only of those cases where there is no risk, delay, or expense, as where the money is in the next room, or where the surety indemnifies the creditor, or deposites the money, and undertakes, that he shall be at no expense, then the creditor may be compelled to do what he can for the benefit of the surety. (h) And this is the rule of the civil law; (i) and the same principles have been distinctly recognized by the provisions of our act of assembly, which, as declaratory of the common law, give to the surety a right to have the benefit of the security, which he has satisfied, to enable him to take the place of the creditor, and proceed against the principal debtor, (j)
The claim of the creditor can, in no way, be suspended, or put in peril, at the instance of a surety. But if the debt be fully paid by the surety; for the payment of a part will not give him a right to an assignment of the security, (k) then those equities arise, which apply as between principal and surety, and between two or more sureties, as regards the contribution they owe to him who has paid the whole; or in relief of each, so that the burthen may be borne equally, or in the proportions warranted by the terms of the contract. And in such cases, where the parties are before the court, after awarding to the creditor full satisfaction as against all and each of his debtors, it will adjust these equities, without prejudice to him, and, by a decree over, direct that the principal shall be first made to pay, if able, and if not, then that each one of his sureties shall be compelled to contribute his due proportion. (l) *530 The insolvency of the principal is, in no instance, necessary to be shewn; except where a surety alone claims contribution from his co-surety, and the principal is not a party to the case, (m)
But if the creditor has done any act injurious to the security, or has omitted to do that which, by the nature of his contract, he was bound to do, such acts or omissions give to the surety a clear release from his obligation. It must, however, appear to have been the act of the creditor himself, and that his conduct had been directed by his own will, with a knowledge of his rights, and not that it was the result of mere accident or mistake. For there are many cases where equity will set up debts extinguished at law against a surety, as well as against a principal, as where a bond has been destroyed or cancelled by accident or mistake, or caused to be delivered up by fraud; because a surety cannot be allowed to benefit by mere accident or mistake, or to avail himself of the fraud of any one. (n) But where any act has been done by the creditor that may injure the surety, or that alters his situation, it may be turned to his advantage; (o) as where the principal had left a sufficient fund in the hands of the creditor, and he thought fit, instead of retaining it, to pay it back to the principal; (p) or where the creditor made a compromise with the principal debtor, and accepted a part of the debt in satisfaction of the whole from him without a clear or express reservation of the creditor’s remedies against the surety, and of the surety’s right to take the place of the creditor, (q) or where the creditor, by positive contract, enlarged the time of payment, even because of the principal debt- or’s being then unable to pay; or where the creditor expressly stipulated, that he would not sue the principal within a certain time after the debt had become due, so that the surety could not come into equity by a bill quia timet, and have the bond put in suit; (r) or, by paying the debt, have an assignment of the security, so as to enable him immediately to proceed against the principal, or have the same remedy against the principal as the *531 creditor could have had on the original contract, the surety -will be totally discharged; upon the ground that all such acts are against the faith of the contract, by virtue of which the surety had precisely the same right the creditor had, and must be allowed to take his place in all respects; and also upon the principle that the creditor is a trustee of his security, that is, of the bond, suit, execution, &c. for all parties interested in it, or who may ultimately resort to it for relief, (s) And so, too, if the creditor omits to do that which the nature of his contract requires him to do, as if, being the holder of a negotiable instrument, he fails to give notice of its non-payment to the drawer and endorsers, they, as sureties, will he completely discharged. (t)
The sole ground of relief to a surety, as exemplified by these various instances at law and in equity, is, that he has, by the act or omission of the creditor, been deprived of a legal or equitable remedy for relieving himself, or that such remedy has been impaired. (u) But it is distinctly avowed, that the principles under consideration, are not founded on any such acts or omissions of the creditor; hut simply on a presumption of the truth of certain facts, from which mere passive negligence is inferred, and which may he applied alike, and with equal propriety, to all contracts to which there is, in fact, a principal and surety. And consequently, they can derive no support from any thing to he found in this branch of the doctrine upon the subject of principal and surety.
A creditor, however, is not bound to active diligence against the principal debtor; the surety is a guarantee; and it is his business to see that the principal pays, and not the creditor’s; and therefore, mere passive delay has never been held to discharge the surety. This principle, in relation to the liability of a surety, seems to have received the unqualified approbation, not only of the Court of Appeals of this state; but of every other enlightened *532 tribunal by whom the subject has been considered; (w) and yet, according to these principles, now under examination', in direct opposition to a rule of equity thus universally sanctioned, it is assumed, even ex officio, as a fact, that the creditor has been negligent; and that such his mere passive laches, is a sufficient ground for refusing to allow him to obtain satisfaction from the deceased’s estate, unless he can prove, that the’ deceased was the principal debtor, or that the other obligors are insolvent.
Perhaps it may be supposed, that these principles of the court may derive some countenance from the equity upon which securities, or assets are marshalled; as where a creditor has his debt secured by a lien or mortgage upon two funds, and another has an interest in only one of the funds, he may compel the one whose debt is secured by both, to resort to the other, so far as it may be necessary, to satisfy both claims, (x) And where, there are two different sets of parties, and one set may resort to .both funds, and the other only to one, the party who may have recourse to both, may be compelled to resort to the one fund, which cannot be reached by the other, so .as to leave enough for.both. (y)
This equity is, however, never administered ex officio, nor at the suit of the debtor, but only at the instance of one creditor against another ; by which the debtor may nevertheless, indirectly derive benefit. But the securities or assets can'never be marshalled to the prejudice of the creditor; or so as to suspend or put in peril his claim; or upon any other terms than giving him entire satisfaction. . For in making this arrangement, the court cannot lessen his security or vary' his contract; except so far as waiting a short time to ascertain the value, of the estates, can be considered as having that effect. The creditor who calls for it, must shew that the right of his co-creditor will neither be endangered nor injuriously delayed; for if he fails to do so, he can have no other benefit than a subrogation of his. right, or the being allowed to stand in his place.
Hence it is evident, that these principles of the court, can derive no support from the doctrine of marshalling securities or assets.
*533 Some suggestions in favour of these principles may, perhaps, be expected to be found in the rules by which cases of bankruptcy are governed. A bankrupt, when contemplated as a really insolvent debtor, whose effects are about to be distributed among his creditors, may be considered as presenting a state of things strikingly analogous to that of a deceased debtor, whose estate is to be applied in satisfaction of his debts, in due course of administration.
It is a rule of equity, in cases of bankruptcy, deduced from the general principles of the statutes by which the subject is regulated, that no creditor shall be admitted to come in under the commission, so as to obtain more than a rateable dividend, without regard to his security. Hence, when a creditor applies to prove his claim under the commission, he may be called on, in most cases, to deliver up his security, so that the other creditors may have the benefit of the means of satisfaction he has chosen to abandon. If there be a mortgage of the bankrupt’s estate, the mortgagee may have the mortgaged property sold, and the proceeds, after deducting all costs and expenses of sale, applied in satisfaction of his claim as far as it will go, and then come in under the commission for the balance. In short, wherever the creditor holds a double security, he may make choice of either, or pursue both, so he does not obtain a double satisfaction. If he obtains a partial satisfaction by one security, he is allowed to prove against the estate of the bankrupt only, for the balance; and if he comes against the bankrupt for the whole, his claim upon the other security is satisfied, or diminished by so much as he receives from the bankrupt’s estate. If the bankrupt be the principal debtor, his surety from whom the creditor may have obtained a partial or a full satisfaction, takes the place of the creditor to that amount. And if the bankrupt be only a surety, then his assignees have a right to be subrogated to the creditor’s place, in so far as satisfaction may have been made from the bankrupt’s estate for the benefit of his other creditors, (z)
If these regulations on the subject of bankruptcy, should be deemed applicable to the case of a deceased debtor’s estate, about *534 to be administered under a creditor’s suit, they would clearly suggest the propriety of allowing each creditor to come in at once, according to the terms of his contract, for the whole amount of his claim then due; and of calling on him when so satisfied, to assign his securities to the suing creditors, to the heir, or devisee, or to the executor or administrator, or to suffer them to take his place for so much as he had been satisfied for their own benefit or for that of the legatees or next of kin of the deceased.
But the principles of this court are essentially different. In bankruptcy, the creditor himself makes choice of the security, from which he will obtain satisfaction, and the court, so far from lessening the obligation of any of his securities, or driving him from any one of them, will assist him in enforcing his contract to the extent of its jurisdiction, so as to insure to him one complete satisfaction; but here, the court officiously interferes, and throws upon the creditor the burthen of shewing whether the deceased was principal or surety, or co-surety; and then, unless he also proves, that the co-surety or principal debtor, is insolvent, directly contrary to the principles which prevail in bankruptcy, pushes the creditor partially or entirely away from that portion of his security by which the deceased’s estate might have been made liable, (a)
The doctrines of bankruptcy sustains the obligations of the creditor’s contract in all its bearings; the principles of this court strike off a large proportion of its force on the very eve of fruition, and at the moment when the means of a full or partial satisfaction are shown to be immediately at hand. It is evident, therefore, that nothing can be found to sustain these principles of this court in any of the rules applicable to cases of bankruptcy.
It might perhaps, have been urged, that the peculiar circumstances under which the rights of a creditor, and the liabilities of his debtor are presented in a creditor’s suit, calling for the administration of the real assets of such deceased debtor, render it necessary to depart from those rules so clearly applicable in a different state of things, and require the adoption of these principles of this court, in order to do equal justice to all whose interests have been brought into conflict by the death of the debtor.
It is certain, however, that the mere act of God, as the death of the debtor, does not change the rights of the creditor; nor can they be affected by any change, from that cause, in the mental *535 capacity of the debtor, as by his becoming a lunatic. (b) And it is also settled, that no alteration in the civil, political, or pecuniary condition of the debtor can authorize a court of justice to fetter or abolish any of the creditor’s remedies arising out of the personal liability of his debtor, either by confining the creditor to a particular fund; or altogether to the person of the debtor; or by compeling him to seek satisfaction of any one alone, where two or more have been made liable by the nature of the contract, (c)
As where, in England, the debtor had been attainted of felony, whereby all his property had become forfeited; or where he had become a bankrupt, without a certificate, and had his whole estate put into the hands of his assignees; or where by a special act of the legislature all his estate had been vested in trustees for particular purposes; or where the estate of a British subject had, by an act of assembly of one of the states of our Union, been confiscated ; such circumstances were not allowed, in any manner, to impair the obligation of the contract, to diminish the rights of the creditor, or to lessen the liability of the debtor, even although it should clearly appear, that the surety could not have the security assigned to him; or that it would be impossible for him to take the place of the creditor in any respect whatever. A court of equity cannot interpose to enlarge the effect of a legal contract, nor can it be called upon to cut down its then subsisting legal operation. Because, even as in the case of an attaint, according to the law of England, by which the debtor is civilly dead, and all his property forfeited, the law implies from such a contract, that the creditor can charge his debtor’s person in execution; and even in circumstances from which there appears to be no ray of hope of getting any thing by it, the creditor has a right to take his chance of that; the court has no right to judge for him what he can make out of the imprisonment of his debtor, operating by way of duress upon the feelings and affections of third persons; or as it is expressed in an ancient English statute, ‘until he have made agreement, or his friends for him.’ Because it is the contract of the parties, and the court has no right to apply the terms, ‘wilful, malicious, and oppressive,’ to what the law under those circumstances allows. Such are the doctrines of the English Court of Chancery, by which it appears, that no hardships or sufferings, however *536 extreme, are permitted to shake or impugn the sacred obligation of contracts as between debtor and creditor, (d)
These rigid and inflexible principles of the English code have always been considered as forming a part of the law of Maryland; and have been approved and affirmed by the highest authority of our country. The case of the British subject, whose whole property in this country, where the debt had been contracted, had been seized, and confiscated with a reservation in favour of his just creditors, presented an apparently irresistible claim on the part of the debtor for relief, so far as to compel the creditor to seek satisfaction, in the first instance, from the confiscated estate of his debtor; yet after the most mature consideration it was finally held in England, that even such a case would not warrant a court of justice in giving such relief to the debtor as would, in effect, impair the obligation of the contract, (e)
By the constitution of the United States, it is declared, that ‘no state shall pass any law impairing the obligation of contracts.’ (f) Of the history or causes of this restriction upon the legislative power of the states, it is unnecessary here to say any thing; nor is it necessary to speak of the kind of legislative enactments to which it properly applies. It is sufficient, as regards the subject under consideration, that the people, or sovereign authority of this country, has deemed the obligation of contracts, at least as between individuals, creditor and debtor, as a matter so important and so sacred as to be guarded by an express provision of constitutional law, unalterable even by the government itself. Now if, as it is thus declared, the legislative department cannot, by any of its acts, impair the obligation of contracts, it surely could not be allowed, that the judicial department should effect the same thing by means of any judgment or decree. The judicial department applies to particular cases only such rules as the legislature may lay down; but the legislature is prohibited from laying down any such rules, and therefore no such rules can be applied by the judicial department.
Hence, any principles, such as these now under consideration, the effect of which is to impair the obligation of a contract, which *537 the legislature is prohibited from declaring to be rules of law, the judiciary cannot assume and apply, as such. These principles of this court, by which a creditor is prevented from obtaining satisfaction from the estate of his deceased debtor, in certain cases, where others have been bound for the payment of the same debt, it is evident, do, in effect, deprive the creditor of at least a part, and very often of the whole of his security; they do most manifestly, in a material and essential manner, impair the obligation of the contract; and ■ are, therefore, in direct hostility with the general principles of our code as taken from that of England, and with the spirit, if not the very letter of this provision of the constitution of the United States.
But according to these principles the creditor, it is obvious, from the very nature of things, may not merely have his security •materially cut down and grievously impaired, but altogether destroyed. The explanation whether the deceased is principal or surety, and the proof of insolvency is almost always the occasion of embarrassment and delay. Notwithstanding which it is declared, that the claims having been then barred by the statute of limitation, as against others, forms of itself no ground for letting the creditor in to obtain any satisfaction from the estate of the deceased. And if it should not be barred by limitation, still the attempt to recover satisfaction from the other joint debtors may fail, from a variety of causes, against which no diligence of the creditor can guard. The other debtors may be in desperate and rapidly sinking circumstances although then not reputed to be insolvent. They may be residents of other states, or remote places, from which it may be difficult or impossible to obtain correct information as to their pecuniary condition; or they may be dead and their representatives so numerous and dispersed as that the creditor may find it impracticable within any reasonable time, to procure any kind of proof of their insolvent condition.
Upon the whole, I have been long satisfied, that these principles of this court in relation to the distribution of the real assets of deceased debtors operate hardly, injuriously, and perniciously upon the rights and interests of creditors. Yet as it appears, that they have been steadily continued in full force for more than thirty years past; and as I found them firmly rooted and in full vigour when I came here, I shall therefore continue to acquiesce under their operation; leaving it to other and higher authority to correct the evil, if it should be so considered, in such manner as may be deemed most proper.
*538 Two of these excepting creditors, however, contend that, although these principles of this court may he established, they do not apply to their cases as the holders of promissory notes which had been endorsed by the deceased; because every endorser of such an instrument being considered as an original maker or acceptor, and chargeable as such, he is not merely a surety, but must be treated as an original debtor for the whole amount. This is certainly the law in relation to such a contract; but it is not the whole law as regards the matter under consideration.
The holder of a promissory note, or bill of exchange, which has come to his hands through several endorsements, has a double security; and it is a rule of law and equity, that a man may make use of all the securities he has, until he receives satisfaction for his whole debt. And, therefore, as to the holder, the maker, acceptor, drawer, and each endorser is, as a distinct debtor, liable for the whole amount, and each one may be sued separately as such, at the same time; but the court will not allow the holder to obtain more than one entire satisfaction. It is clear, that, as regards the holder, they all stand as principal debtors; but, in point of fact and law, the several endorsers are warranters of the note or bill, and although they may not be strictly sureties, (g) who stand in the relation to each other of co-obligors in a joint and several bond, entitled to contribution from each other on the failure of their principal; yet they are, in truth, sureties standing as a series of guarantees, all of whom pledge themselves for the sufficiency of the maker or acceptor, and each one responsible for all who stand before him. The primary liability resting upon the maker or acceptor, and the drawer and each endorser liable only in a secondary degree. Considered as sureties to this extent, and in this order, all the doctrine respecting principal and surety applies to their relative situation, except as regards contribution; in place of which, each endorser, on taking up the note or- bill, has a right to stand as a creditor against every one before him as his debtor to the full amount of the note or bill; but a prior endorser can have no claim upon a subsequent endorser. (h)
Hence, it is clear, that these principles of this court apply as *539 strongly to a case of this kind in favour of a drawer or endorser, as to the case of a common money bond, where the deceased was bound as one of the obligors, and was, in fact, only a surety.
Considering these rules as established, and as applicable to this case, the next inquiry is as to the kind of proof which may be received and deemed sufficient in cases of this description, in explanation of the nature of the contract, and as to the insolvency of any of the obligors; _ that is, whether the deceased, whose estate the court is about to administer, was principal or surety; or, if a surety, then whether the principal or co-surety be insolvent or not.
It is well settled, as between principal and surety, that parol proof may be admitted to shew, that, by a written contract, according to the literal terms of which, two or more are equally bound as principals, the one is, in fact, a principal, and the others no more than mere sureties; because such proof does not purport to interpret or expound the written instrument, but merely to establish a circumstance connected with the contract in relation to which the writing did not profess to speak, (i)
The fact of insolvency is, from its peculiar nature, involved in much obscurity. The equity on which a surety claims contribution of his co-surety, is founded upon the fact of the principal being really in a condition of insolvency; not on the mere circumstance of his having been declared a bankrupt, or having applied for the benefit of the insolvent laws. A man, according to the English law, may have been declared a bankrupt, and yet be able to pay thirty shillings in the pound; and so too, in this state, a person may have been driven, or indeed, from sinister motives, induced to apply for the benefit of the insolvent laws, and yet be not in a condition of insolvency. But it is that actual condition alone of the principal or co-surety, without regard to any movement under the insolvent laws, which, according to these principles of this court, can authorize the creditor to claim satisfaction from the deceased surety’s estate. A man, while he carries on trade, or has any business that affords him a prospect of gain, is not an insolvent, though his effects may not be sufficient to pay his debts; for he has it in view to pay all, and may be enabled to do so. But if his business fails, and leaves him no prospect of paying his debts, he is then, in the common sense of mankind, insol *540 Vent; because he is in that condition ill which his creditors must lose by him (j)
A release, provisional or final, under the bankrupt or insolvent laws, furnishes at least, prima facie evidence of this condition of insolvency which gives to the creditor a right to demand satisfaction from the estate of the surety; and to one surety to claim contribution from his co-surety. It has been said, however, that in the absence of such proof as this, the creditor must shew, that he has brought suit against the principal, and has been unable, by execution, to extract satisfaction from him. The return of nulla bona, however, to a fieri facias, proves no more than that the sheriff, if he has done his duty, has been unable to find any property of the defendant within his county; and yet the defendant may be wealthy, and have a large amount of property elsewhere; or of a kind not within reach of the fieri facias. (k) But if proof of this description were required, then, as it is of a kind which the creditor can only put together and create by due course of law, it would seem to follow as a necessary consequence, that he should be allowed time thus to fabricate it. If so, it would be enough, at least, for this purpose, that he should bring his suit before his claim had been barred by the statute of limitations ; and that may be when he files his claim in this court. There may be, and often are, many creditors whose claims are founded on joint and several obligations; and which will, therefore, require some proof. Now if the final distribution of the deceased’s estate were to be suspended until full proof of this kind, by judgment and execution, could be fabricated; the delays might be almost interminable. Proof of this description, however, where it actually exists, shewing a failure to obtain satisfaction by an execution, running over a county where the debtor resides, or within which, if at all, he must be presumed to have some property, may be received as sufficient prima facie evidence of insolvency, to found the creditor’s claim upon the deceased’s estate; but such proof never has been, mor ever ought to be held to be indispensably necessary. (l)
In the great majority of eases it would be impracticable, or exceedingly tedious and expensive, to procure any' other proof of insolvency, than that of general reputation in that part of the country where the debtor resides, and is known. Where the debtor *541 was a merchant, proof of his having suffered his notes to be protested for non-payment, with other circumstances, have been deemed sufficient. As where it was proved, that the maker of the note was in bad circumstances, and was supposed and reputed to be insolvent; and that he had left his usual place of residence sometime before, and had not returned to it; such proof was considered as sufficient evidence of a known insolvency. And so in this court, proof of insolvency by general reputation, has been deemed sufficient. But in a creditor’s suit, it has been held to be enough, as in this instance, to produce ex parte affidavits to that effect; unless the fact be controverted, and full proof thereof should be expressly required by a creditor or party, when it must be proved according to the regular course of the court. (m)
*542 I am therefore of opinion, that these affidavits of John W. Duvall, and Robert Welch, of Ben., must in this case be received as sufficient evidence of the insolvency of the makers of the notes which were endorsed by the deceased.
It appears from the vouchers of the claims, as referred to, by the auditor, that the deceased, Beale M. Worthington, had, in his lifetime, given a single bill to Warfield 8f Ridgely, No- 39, for the payment of a certain sum of money; and was, besides, indebted to the same firm, on an open account, No. 42; and further, that he had given his single bill, No. 40, for the payment of a sum of money to David Ridgely &f Co.; and was indebted to them by an open account, No. 41; and that all four of these claims have been assigned by the surviving partner of those firms, to the present claimant, George Wells. It also appears, that the same firms had become liable to the deceased as the endorser of certain promissory notes, the holders of which, now claim satisfaction from his estate.
It is perfectly clear, that if those firms of Warfield Ridgely, and David Ridgely Co., had themselves, claimed payment of the four debts they assigned to Wells, that the deceased in his life-time, might have set off, or had a discount in bar of so much as he had been compelled to pay as endorser for those firms. And this same right of the deceased, now subsists for the benefit of his representatives; unless it can be shewn that the assignee of those debts, stands in a better situation than those firms under whom he claims. But it is a well established general rule of this court, that the assignee of a chose in action, except negotiable paper, such as a note or bill of exchange not then due, takes it subject to all the equity it was liable to, in the hands of the obligee or original creditor, whether the assignee had notice at the time, of such equity or not. Length of time and circumstances, may however, vary the rule and strengthen the claims of the assignee, (n) But in this instance, there is no single circumstance which can give this assignee any claim to a modification of the rule in his favour. It must, therefore, be applied to this case as fully as suggested by the auditor; and if it shall appear, that his claims are more than covered by the endorsements for which the deceased’s estate is liable, they must be rejected altogether; otherwise'he maybe allowed to come in for the balance.
*543 It is sufficiently obvious, upon general principles, in a creditor’s suit to administer the assets of a deceased person, that no debt can be allowed and paid out of such assets, which was not contracted by, or due from him, during his life-time; and it has been distinctly so settled by this court, and by the Court of Appeals, (o) The claim of A. J. Miller, assignees of James Taylor, designated by the auditor as No. 44, which appears to have been a debt contracted since the death of Beale M. Worthington, must therefore be rejected.
When I came here, I found many instances of creditor’s bills against the heirs of the deceased debtor alone, without making his executor or administrator a party; indeed, it seemed to have been considered by many as the correct course of the court, (p) It was evidently attended with inconvenience, as is exemplified in this case. But by a decision of the court of the last resort, reported and published since this bill was filed, and only a short time before this decree for a sale was passed; it has been finally and correctly settled, as a general rule, that the personal representative, as well as the heirs and devisees, must always be made a party, (q) Here the administrator has not been made a party, and on that account, this decree might have been withheld or reversed, had the objection been made in time.
It appears, from the report of the auditor, that there are some personal assets to be distributed. It is eertain, that those assets must be first administered in due course of law, and then what remains due, after they have been exhausted, must be paid from the real assets, so far as they will go, to those who have not been satisfied” in due proportion, or whose claims have been unjustly rejected by the administrator.
Whereupon it is Ordered, that the said exceptions to the auditor’s report, and the objections stated by the auditor to any claim, *544 so far as the same may be in any manner at variance with the principles herein laid down for the government of this court be, and the same are hereby overruled. And it is further Ordered, that this case be, and the same is hereby referred to the auditor with directions to state a final account accordingly.
After which, the auditor filed his report made up as of the 26th of June, 1830, in which he says, that in obedience to this order he had examined the proceedings; that an extract from the second account passed by the administrator had been lately filed, from which it appeared, that dividends of the personal estate had been allowed on claims Nos. 1, 5, 7, 8, 13, 14, 16, 31, 32, 33, 35, 37, and 43. That he had, therefore, re-stated those claims, and also stated an additional claim, No. 45, lately exhibited. That he had also stated an account between the estate of the deceased and the trustee, in which the proceeds of sale were applied to the payment of the trustee’s allowance for commission and expenses, costs of suit, and dividends on the claims stated, excluding Nos. 39, 40, 41, 42 and 44, agreeably to the said order, and that he had then stated a further account, C, in which the principal and interest, received by the trustee, and now deposited in court, were applied to the payment of said commissions, costs, and claims, in the usual manner. By an order, passed on the 5th of July, 1830, this report was confirmed, and the trustee directed to apply the proceeds accordingly.

 Strike’s Case, 1 Bland, 85.

6) Mildred v. Neill, ante 354; Ewing v. Ennals, ante 356.

 It appears from the auditor’s report, subsequently made and passed upon in this case, that the expenses of the survey for making the assignment of dower, were allowed out of the proceeds of the sale; but no decree confirming to the widow her dower, was ever called for or passed.

 Hindman v. Clayton, ante 341.

 Kilty v. Brown, ante 222.

 Edmonson v. Frazier, 1 Bland, 92.

 Co. Litt. 290; Markal’s case, 6 Co. 4; Plasket v. Beeby, 4 East. 485.

 1721, ch. 14, s. 2.

 1729, ch. 24, s. 16.

 Land Hol. Ass. 145.

 Co. Lift. 240; Whittingham’s case, 8 Co. 84; Anonymous, 2 Cha. Ca. 163; Cary v. Bertie, 2 Tern. 342.

 Cooke v. Parsons, 2 Tern. 429; Newton v. Bennet, 1 Bro. C. C. 137; Williams v. Whinyates, 2 Bro. C. C. 399; Shiphard v. Lutwidge, 8 Ves. 29; Birch v. Glover, 4 Mad. 376.—

 Chaplin v. Chaplin, 3 P. Will. 368 ; Uvedale v. Uvedale, 3 Atk. 117; Powell v. Robins, 7 Ves. 209; Lechmere v. Brasier, 2 Jac. & Wal. 290; Brookfield v. Bradley, 4 Cond. Cha. Rep. 297.

 Mallack v. Galton, 3 P. Will. 352; Powel Mortg. 986.

 Ex parte Philips, 19 Ves. 123; Ex parte Hall, 4 Cond. Cha. Rep. 74; Shelf. Lun. 357.

 Steel v. Alan, 2 Bos. & Pul. 362; Pillop v. Sexton, 3 Bos. & Pul. 550; Sackvill v. Ayleworth, 1 Vern. 105 ; Owen v. Davies, 1 Ves. 82.

 5 Geo. 2, ch. 7.

 Lechmere v. Brasier, 2 Jac. & Wal. 290.

 1773, ch. 7; Pue v. Dorsey, 1 Bland, 139, note.

 1785, ch. 80, s. 2 ; James v. Boyd, 1 H. & G. 1.—

 1785, ch. 80, s. 7.

 Orchard v. Smith, ante 318; Brook v. Smith, 6 Cond. Cha. Rep. 403; Kelsall v. Kelsall, 8 Cond. Cha. Rep. 61; Powys v. Mansfield, 9 Cond. Cha. Rep. 445. 1785, ch. 72, s. 5.

 Jackson v. Rawlins, 2 Vern. 195; Galton v. Hancock, 2 Atk. 436; Madox v. Jackson, 3 Atk. 406; Angerstein v. Clark, 2 Dick. 738 ; Cockburn v. Thompson, 16 Ves. 326; Morrice v. The Bank, Ca. Tem. Tal. 222 ; Higgens’ Case, 6 Co. 45; Bidleson v. Whytel, 3 Burr. 1548; Drake v. Mitchell, 3 East. 258 ; Riddle v. Mandeville, 5 Cran. 330.

 Collins v. Griffith, 2 P. Will. 313; Ex parte Rowlandson, 3 P. Will. 405; Haywood v. Ovey, 6 Mad. 113.

 1797, ch. 114; Kilty v. Brown, ante 222.

 London v. Richmond, 2 Vern. 422; Meux v. Maltby,2 Swan. 284; Newton v. Egmont, 6 Cond. Cha. Rep. 346.—

 1785, ch. 72, s. 13; 1826, ch. 159.

 1785, ch. 80, s. 7.

 Bond v. Bond, ante 353; Mildred v. Neill, ante 354.
Dorsey v. Cooke. — This bill, filed on the 24th of November, 1786, very briefly states, that Ambrose Cooke died, indebted to the plaintiff, who brought suit and recovered judgment against his executrix for his debt, when assets should come to hand; that the executrix had paid away the whole of the personal estate of the deceased, who left some real estate; and that the defendant was his heir, and a minor. Upon which it was prayed, that the land might be sold for the payment of the debts of the deceased. The defendant answering by his guardian ad litem, admitted the truth of the allegations of the bill.
16i7i October, 1789. — Hanson, Chancellor. — Decreed, that the land be sold for the payment of the just debts of the said Ambrose Cooke, deceased, in due course of administration; that William H. Dorsey be the trustée, 8tc., to sell the said real estate, or such part thereof, as may be necessary, for the purpose aforesaid; and the manner ofhis proceeding shall be as follows : he shall first give three months notice in the Baltimore and Georgetown newspapers, and by advertisements set up at the most public places in the county, to the creditors of the said Ambrose Cooke, to bring in to the said trustee their respective claims legally proved. And he shall give six weeks notice in like manner, of the time, place and terms of sale, &c. that the said trustee shall lodge in this court under his hand, with his affidavit of the truth thereof annexed, a just and accurate account of the sales, specifying to. whom made, with the time and price; and specifying also, his disbursements, payments and applications of the money; and the said trustee shall apply of the produce of the sale, such part as may be necessary to the discharge of the just claims of .the creditors of the said Ambrose Cooke, in due course of administration, after deducting thence all the legal costs of this suit, and his just expenses, and commission of five per cent, allowed hereby to himself, 8cc.— Chancery Proceedings, lib. S. H. H. left. B. fol. 744.

 Kearslake v. Morgan, 5 T. R. 513; Clark v. Young, 1 Cran. 181; Harris v. Johnston, 3 Cran. 311; Powel Mortg. 1083; Hoffman v. Johnson, 1 Bland, 103; Dorsey v. Campbell, 1 Bland, 356.

 Burn v. Burn, 3 Ves. 574; Just. Inst. by Coop. 613.

 Cary’s Rep. 17.

 Ex parte Wildman, 1 Atk. 110; Galton v. Hancock, 2 Atk. 435 ; Wright v. Simpson, 6 Ves. 734; Ex parte Kendall, 17 Ves. 519; Union Bank v. Laird, 2 Wheat. 390.

 Karnes’ Pri. Eq.b. 1, p. 1, ch. 3, s. 1.

 1763, ch. 23, s. 7 and 8; Lenox v. Prout, 3 Wheat. 520.

 Ex parte Rushforth, 10 Ves. 420 ; Hollingsworth v. Floyd, 2 H. & G. 91.

 Cooke v. -, 2 Freem. 97; Fleewood v. Charnock, Nelson, 10; Parsons v. Briddock, 2 Vern. 608; O’Carroll’s *530 Case, Amb. 61; Peter v. Rich, 1 Rep. Cha. 34; Collins v. Griffith, 2 P. Will. 313; Tynt v. Tynt, 2 P. Will. 542; Dering v. Winchelsea, 1 Cox, 318; S. C. 2 Bos. & Pul. 270; Wright v. Morley, Ves. 22; Craythorne v Swinburne, 14 Ves. 160; Mayhew v. Crickett, 2 Swan, 186; Smith v. Tunno, 1 McCord, 443; Lowndes v. Chisolm, 2 McCord, 455.

 Lawson v. Wright, 1 Cox, 276.

 Skip v. Huey, 3 Atk. 93.

 Eyre v. Bartrop, 3 Mad. 221; Rathbone v. Warren, 10 John. 587.

—(p) Law v. The East India Company, 4 Ves. 824.

 Ex parle Gifford, 6 Ves. 805; Boultbee v. Stubbs, 18 Ves. 20.

 Baker v. Shelbury, 1 Cha. Ca. 70 ; Renelaugh v. Hayes, 1 Vern. 190.

 Parsons v. Briddock, 2 Vern. 608; Nisbet v. Smith, 2 Bro. C. C. 579; Rees v. Berrington, 2 Ves. jun. 540; Wright v. Morley, 11 Ves. 22; Boultbee v. Stubbs, 18 Ves. 20; Samuell v. Howarth, 3 Meriv. 272; Robinson v. Wilson, 2 Mad. Rep. 434; Mayhew v. Crickett, 2 Swan, 190; Gould v. Robson, 8 East, 576; Clarke v. Devlin, 3 Bos. & Pul. 363; Hill v. Bull, Gilmer, 149; Bennett v. Maule, Gilmer, 305 ; Ward v. Johnson, 6 Mun. 6; Hollingsworth v. Floyd, 2 H. & G. 90.

 Ex parte Smith, 3 Bro. C. C. 1; Walwyn v. St. Quintin, 1 Bos. & Pul. 652; English v. Darley, 2 Bos. & Pul. 61; Lenox v. Prout, 3 Wheat. 520.

 Buchanan v. Bordley, 4 H. & McH. 41; Noras v. Crummey, 2 Rand. 323; Hampton v. Levy, 1 McCord, 107; Galphin v. McKinney, 1 McCord, 280.

 Heath v. Percival, 1 P. Will. 682 ; Wright v. Simpson, 6 Ves. 734; Samuell v. Howarth, 3 Meriv. 272; The Trent Navigation Company v. Harley, 10 East. 34; Deming v. Norton, Kirby Rep. 397; King v. Baldwin, 17 John. 384; The Commonwealth v. Wolbert, 6 Binn. 293; Buchanan v. Bordley, 4 H. & McH. 41; Croughton v. Duval, 3 Call. 70; Hampton v. Levy, 1 McCord, 107; Galphin v. McKinney, 1 McCord, 297.

 1 Mad. Chan. 250.

 1 Mad. Chan. 615.

 Ex parte Ryswicke, 2 P. Will. 89; Ex parte Lefebvre, 2 P. Will. 407; Ex parte Rowlandson, 3 P. Will. 405; Ex parte Grove, 1 Atk. 104; Ex parte Marshal, 1 Atk. 130; Ex parte Bennet, 2 Atk. 528: Order of Court, 4 Bro. C. C. 550; Ex parte Goodman, 3 Mad. 373.

 Ex parle Kendall, 17 Ves. 519.

 Owen v. Davies, 1 Ves. 82.

 Jennings v. Elster, 7 Cond. Cha. Rep. 115; Wilkinson v. Henderson, 7 Cond. Cha. Rep. 173.

 Stat. Acton Burnel, 11 Ed. 1; Kilty’s Rep. 143; Holditch v. Mist, 1 P. Will. 695; Wright v. Simpson, 6 Ves. 714; Folliot v. Ogden, 1 H. Blac. 123; Wright v. Nutt, 1 H. Blac. 136; Kempe v. Antill, 2 Bro. C. C. 11; Wright v. Nutt, 3 Bro. C. C. 326; Ex parte Kendall, 17 Ves. 520 ; 12 Westminster Review, 369,

 Wright v. Simpson, 6 Ves, 714.

 Art, 1, s. 10,

 Ex parte Yonge, 3 Ves. & Bea. 39.

 Ex parte Wyldman, 2 Ves. 115; Exporte Marshal, 1 Atk. 130; Tindal v. Brown, 1 T. R. 167; Smith v. Woodcock, 4 T. R. 691; Stock v. Mawson, 1 Bos. & Pul. 286; Walwyn v. St. Quintin, 1 Bos. & Pul. 652; English v. Darley, 2 Bos. & Pul. 61; Clarke v. Devlin, 3 Bos. & Pul. 363; Gould v. Robson, 8 East, 576; Wood v. Repold, 3 H. & J. 125.

 Craythorne v. Swinburne, 14 Ves. 170; Smith v. Tunno, 1 McCord, 451.

 ) Karnes’ Pri. Eq. b. 3. c. 5.

 Goodall v. Stuart, 2 Hen. & Mun. 105.—

 Spurrier v. Spurrier, 1 Bland, 476.

 Fladong v. Winter, 19 Ves. 196; Clark v. Young, 1 Cran. 181; Brown v. Ross, 6 Mun. 391.
Emory v. Seth. — This was a creditor’s bill, filed on the 27th of March, 1806, stating that the late Thomas J. Seth was indebted to the plaintiff; that the personal estate of the deceased was insufficient to pay his debts; that the defendants were his heirs; that he left real estate; and praying that it might be sold, &c. Upon the answers coming in, the case was submitted, and a decree was passed in the usual form, that the real estate be sold; which was sold accordingly.
The auditor in his report, made on the 1st of May, 1813, among other things, stated that account No. 14, was a claim of Marmaduke Tilden and wife, which originated under the will of John Costin, father of the said Ann, by which a share of his personal estate was bequeathed to her. That this claim, to the amount stated in the account current referred to, appeared to be well established against Charlotte Clayland, executrix of Jacob Clayland, who was administrator de bonis non cum testamento annexo, of the said John Costin, by a judgment rendered therefor in Queen Anne’s County Court, of which judgment, a short copy was exhibited with the usual proof; that the securities of the said Charlotte Clayland, in her administration bond, were James Clayland, Sr. and Thomas J. Seth, the deceased ancestor of these defendants. And affidavits of the insolvency of Charlotte; and a certificate of James Clayland’s discharge under the insolvent laws, were exhibited. But it did not appear that a fieri facias had ever been issued on the said judgment against the said Charlotte, as executrix, or that nulla bona was returned; or that any proceeding had ever been had upon her bond; nor was there any authentic certificate of her discharge under the insolvent law.
In the notes of the solicitor of this claimant, it was said, that the auditor had rested his objection as to the necessity of the return of nulla bona, on the act of 1720, ch. 24, which was wholly inapplicable to the case; and that proofs, by affidavits alone, of the insolvency of the principal, were amply sufficient to entitle the claimant to obtain payment from the estate of the surety; and that what was sufficient proof of insolvency, was in all cases, a matter of sound discretion with the court; and was not necessary to be shewn, either by a return of nulla bona, or by a certificate of a legal discharge under the insolvent laws.
26th July, 1813. — Kilty, Chancellor. — Ordered, that the claim of M. Tilden and wife, No. 14, be allowed, and paid as other claims, by the order of 22d June, 1813.

 Coles v. Jones, 2 Vern. 692; Hill v. Caillovel, 1 Ves. 122; Priddy v. Rose, 3 Meriv. 86.

 Carnan v. Turner, 6 H. & J. 66.
Hulse v. Cradock. — This was a creditor’s bill, filed on the 21st of January, 1797, to have John Cradock’s real estate sold, to pay his debts; sale decreed, &c. The sales as made and reported, were absolutely ratified and confirmed. After which, upon ,a receipt of a solicitor for his fee, for drawing the answers of the defendants, being presented and filed as a claim against the deceased’s estate.
28th March, 1799. — Hanson, Chancellor. — This is no debt due from the deceased. It cannot even come in by way of costs, no costs being allowed for drawing answers; it must therefore be rejected.

 Harwood v. Rawlings, 4 H. & J. 126; Duvall v. Green, 4 H. & J. 270; Bond .v. Bond, ante 353; Flemming v. Castle, ante 355; Dorsey v. Cooke, ante 526; Emory v. Seth, ante 541.

 Tyler v. Bowie, 4 H. & J. 333.